Morning is case number four nineteen zero zero five two and that case is in the radar C. F. and R. F. We'll show the present by Miss Wood and the appellee present by Mr. Manchin. This would you may proceed. Good morning, justices. May I please the court counsel. There are two primary issues involved in this case. The first question or concern would be that of how many and what types of services should be incorporated into a client service plan when we're dealing with parents involved in the juvenile court system. This case began with a domestic battery incident involving the mother of the two children and their father. Obviously, any client service plan would need to include directives related to domestic violence evaluations and recommended treatment. She did that. She completed her evaluation and treatment in this case by June 12th, 2017. She also completed a nurturing council. Are you taking the position that the parents only have to complete the services that brought the child into care and that if other issues are identified, that it is inappropriate for an agency to incorporate treatment or whatever is necessary to address those issues in the service plan? I believe most of the services that were implemented in this case were appropriate. Certainly, the domestic violence being one of them, parenting, education, important, that was completed by the mother in this case. There was also the requirement for her to complete a substance evaluation and follow up treatment. The record's not very clear on why that were the case. I think there were some allegations that perhaps some of those issues may have contributed to the domestic incident, but at least there was some usage. Perfectly appropriate. Nyasha Mitchell completed those services, in fact, going through intensive treatment for that. The mental health evaluation in this case, ironically, was not requested until much later in the case. The record is completely unclear as to why, although I would agree that perhaps that can't hurt to have parents involved in the system to have mental health evaluations to determine if there are hidden issues that should be dealt with in order to ensure these children are returning to a safe and comfortable home. Mom acknowledged that she'd been previously medicated.  Bipolar, I think she called it bipolar depression. Exactly, yes. And so whether or not that required for her to be fully re-evaluated or not, I don't know, but she did it. She completed that evaluation, and that initial evaluation did not require any recommended follow-up treatment. However, for some reason, she started counseling with a Joel Eckert for a period of time and then transferred her counseling to Jason Woodford at the Center for Human Services. The record indicates she met with him for approximately one year. Jason Woodford testified that her engagement in that process was appropriate, that he did not believe that any of her mental health issues had any direct bearing on her ability to parent her children in a safe and healthy manner. There was no testimony from any expert in this case that Ny'Asia ever suffered from any issue that directly impacted her ability to appropriately parent her children. Well, the mental health component wasn't the primary reason for why she ultimately was found unfit. With all due respect, I disagree. My reading of the record would indicate that by the end of the series of best interest hearings that took place in this case, and this was a bit unusual, those were somewhat protracted due to the younger child having a different set of circumstances than the older child. There was testimony from a caseworker, I believe it was on November 30th of 2017, that Ny'Asia had completed her services successfully. But when the parties reappeared, and the guardian in line had asked about that, and there was some touchstone regarding now housing and unemployment. In January, my recollection of the record would indicate that the emphasis was not so much placed on the mental health component because nobody could really tell the court whether or not that was successfully completed, whether there were further recommendations. We know that she'd been in treatment for protracted and extended periods of time. The health and Jason would for that appear to be handled appropriately by mom. But in January 2018, at the last stage of the best interest proceeding, we're now hearing that she has unstable employment and unstable housing. And my reading of this record would indicate that she moved to Chicago, away from all of her services, away from all of the caseworkers, away from not a stable home environment, but at least a more stable, away from her employment, away from her transportation, away from everything. She did. Her explanation for that being, I've been trying to get back to home from the beginning. I am a Chicago native. That is where my family is located. I believe that's where the paternal aunt in this case also resided. We played an integral role in having continued contact with these children and even requesting that they be placed in cover. There was a maternal grandmother in Chicago. Naisha testified that in the early stages, she did believe it was more appropriate for her to remain in Bloomington, even though that was not her home base. And with her relationship with the children's father ending, there wasn't a lot there for her for support. But I was never clear that it ended. It appeared my reading of the record would indicate that everyone was satisfied in the last at least several months of the case that the parents were not ending their relationship. And again, I've dealt with a number of juvenile cases that are in domestic incidents. The automatic assumption is that the participants in that domestic accident may never have a relationship again, ever. And with all due respect, I disagree that that should be a benchmark analysis. I think every case needs to be looked at differently. But at least in this record, it did not appear that there were ongoing issues of violence between those parents, that they were hiding in the relationship. I think the GAL at one hearing went into some detail about questioning whether there was any veracity to the thought that that relationship had been maintained. I believe it appears that the parties walked in visiting with their children together. There were no reports that those visits were not going well between either parent and the children, or the parent themselves. I'm assuming that the problem was that at the end of this hearing, yes, Naisha had moved. And that decision was not well thought of by a lot of folks. And it probably shouldn't have been, in light of the fact that she was, in my estimation, appearing to be close to the finish line, for lack of a better term in this case. And that those services would be more readily available. Basically, she was within six weeks of stable housing, and would have been done, then without consulting her caseworkers or anybody else, as she has done throughout this case. She would let the problem create itself first, then she would talk to somebody about it. She'd lose her job, then she'd talk to somebody about it. She'd lose her housing, then she'd talk to somebody about it. Now she moves to Chicago, and everything falls apart. Now her visitation becomes spotty. Even the father's sister, the one who was going to take over, said, look, I've offered them visits any time and every time they want. They don't take it. If I got the kids for a week, they'll come one time. I've offered to take them to places they don't want to go. So, her housing was now bad, her employment was bad, her visits were bad, she was now with a counselor in Chicago who was saying she's disingenuous and she's not going to get anywhere with me, obviously. And of course, her argument was, well, I just haven't had enough time, 30-minute sessions aren't enough. But the point was, she'd gone from being very close to being done to this self-destructive course, which now put her in a position where she was in far worse circumstances than she had been at the time she was close to being at all. Perhaps. Maybe not the most responsible decision, but I... Well, but isn't that what they look at when they're deciding, should we be returning these children to this person or not? That's the all-encompassing question in these cases. I mean, how far does the bar need to be set for a parent to be re-implied when they serve their child? As I indicated in our... I kind of put visitation at the top. Well, I... If you don't visit your child, and you're not making any effort to visit your child, that would seem to me to be a fairly low bar. It's not one that's requiring you to attend any services, you're not required to pass any tests, it's just, am I willing to make the effort to go visit my child? If I'm not, then why would they be considered in return? I'm not as convinced that the record would indicate that the visitation piece of this at the end was as lacking in appropriateness as maybe the score may be. It appears that certainly visits were cut down because of the geographic distance. That creates an impediment. It's unfortunate, quite frankly, I think, that the case workers did not even consider, and maybe the end result wouldn't have changed, but didn't really even consider placement with the paternal aunt in Chicago. So maybe this family could have returned to community roots and family. Naisha testified early on in the proceedings that she feels she would have done better if she would have been in that kind of support system. My reading of the record would suggest that the concern was now that she relocated, not so much that there were substance abuse problems again, I don't think there was any evidence of that, or that the counseling was a significant concern. She could be in counseling for a lifetime and have good and bad experiences with those counselors. And they could return children, even if she's counseling, that's not a problem. And that the one person she had the longest relationship with, Jason Woodford, said people do commute to my housing after they have their children returned and there's no safety issue. The problem was she was living with friends and family, and she had periods of unemployment, which she tried to explain. And my point is, is that what we're going to look at in these cases? Because there are hundreds of thousands of families who live transiently in this country, this state, and the world. There are numbers of families who live in poverty. There are families who don't look like they live in poverty, but are in poverty, because they're outspending their means. There was never a nexus connected with Nyesha, who had cared for her eldest son until he was four and a half years old and removed from her care. That their poverty, or that her housing, or that her employment, was resulting in neglectful conditions for them. The problem was she got into a very serious domestic incident with his father. The problem was not that, and so the cases in Illinois talk about, you know, are we bootstrapping conditions that all may be appropriate for a family. It is appropriate to maintain housing for certain. It is appropriate to have a job if you need it to support yourself. But if you don't, is it then appropriate to suggest that is the rationale for permanently severing the child's relationship with you? I don't think so. And that gets us to the second piece of my two sets of primary concerns, which would be, let's assume Nyesha was unfit. That the housing, the unemployment, the falling off on certain services when she relocated back to Chicago are enough to consider her leave unfit. Does that mean that we need to turn ourselves directly to the goal of permanency by adoption? There are other options within the Student Law Court Act. And my experience over about 25 years of being in and out of the juvenile court system, I don't do a lot of these cases, but enough to kind of see changes, is that the response to the horror stories of children lingering in legal limbo and not having permanency for themselves or stability has turned to, they need to be freed for adoption. And we're ignoring a viable option of guardianship, which could be very appropriate in this case. Did the trial court, well, did the trial court consider factors beyond the statutory factors in determining best interest? I can't tell. It appears that the only considerations, but I take that back. There was some testimony and a little bit of argument related to cultural ties, whether or not Pontiac Illinois would be the best community for these two children. It appears that really the energy was placed on should Nyesha's unfitness by stipulation of one child or by finding on a second child, then lead to one goal, termination. Well, if the trial court applies the statutory factors and ultimately makes a judgment as to best interest, then we're left in a position of upon a very deferential standard of review to that judgment call, correct? That's where we're at here. Yeah, I believe this is through a generous analysis of whether or not the trial court's decision was a manifest abuse of the evidence. I do think it's a manifest abuse of the evidence not to consider other options available, particularly when we are- Did someone propose guardianship and the trial court rejected it? No. They didn't. And so what you're proposing is that the trial court, sui sponte, raise an alternative resolution, which neither party, none of any three parties, including the GAL, pursues. And then on its own, set a separate legal course for the children. That's what you're proposing. Yes. We should do that even though the record is completely devoid of any evidence that anybody even used the G word at any time during any hearing. Yes. It's so unfortunate. I wish that would have brought the court's attention. And I'm going to, with all due respect, indicate that I hope, because we're dealing with minor children, and their fates are in the hands of certain adults who may or may not be doing things in their best sense of advocacy, might have independently considered guardianship, given the substantial evidence that was presented to the court and available regarding the number of people who've been involved in these children's lives. You know, there's an old adage. It takes a village to raise a child. The village has been raised. The child has been cared for substantially by the paternal aunt, has had substantial connections with maternal grandmother, has had substantial connections with mother. These children know their mother. They are excited to see her. They enjoy their time with her. They're sad when they see her leave. And they've had loving care by the girths, the foster parents, who have collaboratively worked together to raise these children, not unlike many other families. In many cultures, where aunts and uncles and neighbors and other people in a child's life put their resources together to make a child safe, healthy, and happy. And so when we talk about stability for children, I wonder if we're forgetting that that's a piece of stability. To be able to enjoy those people long term and not worry that if adoption is allowed, we are totally at the mercy of these adoptive parents who say they may consider continuing the relationship, but privately so, they have no obligation to do so. I had a case recently that I needed, where a child was in the care of her teacher, who lived with her, the teacher lived with the teacher's elderly grandparents. The mother had contact with the child while working on substance abuse issues. The father had separate contact, and the paternal aunt had contact, and then of course, the guardian, the teacher, and her parents. That child wasn't struggling with transitioning between households. She wasn't crashing and burning. There was no evidence that these children were either. There's a wide breadth of things that need to be part of a child's life. And so our ultimate concern, of course, is that children linger. I used that term earlier. They don't have permanence. But why can't permanence include seeing your mom? And maybe your mom finally becoming responsible enough to get the job we want to see her have, to maintain her health, and to have regular employment. But even if she doesn't, and she's a visiting part of your life, isn't that okay? Because these children aren't being shoved from foster family to foster family. They have loving foster parents who probably would like to become parents. In recognizing that juvenile cases are sui generis, you don't want us to wait for a set of facts where we're allowed to actually address that issue. Because it's been raised in trial court. You want us to do this. You respond to it. I think you would have to if you were to accept my argument. And I hope the record has enough information available to allow you to feel like you can do that. I think these cases are managed differently. And the case law supports that. I think that there is a delicate balance between protecting children and ensuring that fundamental rights of parents to their children are also maintained. Quite frankly, I don't care about my issue as far as fundamental rights to be a parent. I care about these two children being able to maintain a relationship with someone they love. This is different than many of the cases we deal with. Where parents are not visiting at all. Or are having troubles during the parenting time. Or are continuing to engage in behaviors that are inappropriate. And children need to be free to have parents who will care for them responsibly. That isn't this case. We have a mother who has faced the same hurdles that many, many other parents in this state encounter. In our city encounter. I think she did a lot to try and complete services that were required of her. And my worry is that although today as we sit here, a guardianship would not allow those children to be with their mother. But it would allow them to see their mother. And it would allow there to be the ability for her to petition the court if she were to be prompted and able to reunite herself with those children. That day may never come. But even if it doesn't. Isn't it a valuable piece of these children's lives to maintain that relationship in some way, shape, or form. Thank you. Thank you, counsel. Mr. Manchin. Good morning, Your Honor. Please support counsel. In this case, the trial court found the respondent mother to be unfit on several different grounds. She was found unfit as to one child based upon her admission of unfitness. As to the other ones, the trial court found that she was unfit for lack of interest, care, or responsibility. And unfit as to both for lack of reasonable progress in two separate nine-month periods. On appeal, the respondent is only challenging the finding of lack of interest, concern, or responsibility. Raising policy questions about what kind of services can you request a parent to do, and what kind of evidence can the court consider in determining interest, concern, or responsibility. This court need not address those questions. The unchallenged findings of unfitness based upon lack of progress in itself justify the trial court's finding of unfitness and limits any claim regarding lack of interest, concern, or responsibility. Beyond that, the court's finding of lack of reasonable interest, concern, or responsibility is current. This is a parent that, by her own admission, did not do much of anything the first year this case was involved. There were some services done, but little. She began doing services only after a petition to terminate her parental rights was filed. That is not reasonable interest, concern, or responsibility, even if she does do services. Then you have the problem of how does she do the services? It's sporadic. Her contact with the one expert, her counselor, is off and on. And we don't know whether it was addressing the concerns that are needed because he would not give anybody any reports. Then we have the fact that she leaves two jobs and moves to Chicago without telling anybody. She claims she moved to avoid homelessness because of the support she had in Chicago. Ignoring the fact that she had a great deal of family support right in Bloomington that she was leaving behind to go to Chicago where she had no plans, no job, no home. That is not reasonable interest or responsibility. And Justice Yarman, your point about visitation is right on because this is a case where she moves and they provide train tickets, train rights for her to be able to make the visits. She doesn't make all the books. The aunt is given contact with the child in Chicago with the children. So anytime, anywhere you can visit, every time, but maybe once, maybe twice, the respondent has a different excuse as to why she's not visiting. This is simply not reasonable interest, concern, or responsibility. The trial court's findings on fitness should be affirmed. With respect to counsel's policy argument regarding the superiority of guardianship or allowing a child to be raised by a village, it's interesting. What the law has passed with the legislature is that the trial court can only consider guardianship after they rule out termination and return home. So the claim that the trial court has a sui sponte obligation to consider options other than termination is simply contrary to the statutes, contrary to the law. And it's a solution that was never requested in the law. So to say that the trial court erred because you did not consider guardianship, you do not have to, and when the statute says you have to consider termination first. What is that language, counsel, that you have to consider termination first? Well, that's a paraphrase. In specific final cases, I have several cases studied in my brief where the courts specifically held Thank you. And in Julian and his formative cases, in Ray Entee, and they're on page 17 of my brief, in Ray Entee and in Ray Shantahala O, the court said that the unexpressed language of the statute courts may consider return home, guardianship as a permanency rule only after return home and adoption have been ruled out. Okay, after return home and adoption have been ruled out. In Julian M., which is also studied in my brief, the parents raised a constitutional claim saying that the statute was unconstitutional because guardianship was a more appropriate, more fit, a better result than adoption. And Julian M. rejected that saying no, the legislature has reasonably determined that adoption, in these type cases, adoption best serves the child. So, counsel is raising a policy claim that is better addressed by the legislature than this court given the statute and given the way the statute has been interpreted and given the language in Julian M. discussing the differences between guardianship and adoption and how does it serve the public and the interests of children. So, there is simply no way this court can adopt the Respondent's provision that this trial judge erred because he followed the statute and went to adoption first. Rather than considering options other than termination. According to your argument here, the only way we could consider Respondent's argument regarding guardianship would be to find that the trial court's best interest determination was in error and that termination was not in the child's best interest. And Respondent has made no claim in her brief today that the trial court did not consider any of the solicit statutory factors and my recollection was that he did refer specifically to them in making his determination that yes the best interest of the child and children will be served by termination in this case. What happened in this case was there was a termination. One child second child in the board petitions termination as to the first child, mom admits no fitness. Best interest hearing are held that no final resolution will reach second termination petition filed as to the second child adding new allegations as to the first. Then the trial court finds on fitness the lack of interest and lack of progress in several different time frames. And they gave mom more time. Yeah, mom had a great deal of time and at one point it was fairly close to being done but then it decides okay I'm done with this I'm taking off to Chicago. Counsel suggests that at that point they should have changed the guardians to somebody up in Chicago. Well is the court supposed to uproot the children and move them up to uproot the children again? Because we don't know how long she's going to be in Chicago or whether she's going to be going there to keep the stable whether or not. I think the trial court's decision was appropriate on the facts of this case that the respondent was given every opportunity to regain the children and just did not make there was no chance for the court to return these children at the end of this two year two and a half year period than the day they took the first child away. It is no closer to that. And there's no indication that and her conduct lack of visitation, her move to Chicago, her failure to follow through on recommendations for medication she did continue a relationship with the father for a good deal of this period and there was some question as to whether it was still continuing but the trial court says I'm not going to consider that evidence that there's questions because there's just nothing concrete. But there was a second domestic, there was second incidents where the police were called because of domestic problems between the mother and the father during the course of this thing. And this domestic incident occurred after the respondent had been told, hey, if you continue to have relationships with this guy who's not being aided in his services, you jeopardize your chances of getting the children back. So I submit that yes the mom did some things. But the standard for interest, concern, responsibility is not doing something is whether it's reasonable or whether it's showing reasonable interest. And it's objective standard. And is it reasonable to say that a parent who does some services not others, but does it only because she's facing termination of her rights is reasonable interest and concern. Is it reasonable interest and concern where they don't do visitation or are offered visitation anytime, anywhere, and never do it? That is simply not, the trial court's finding is correct. That our decision is not against the manifesto of the evidence. So I submit that this court should reaffirm the trial court's decision alone. Thank you, Mr. Manchin. Any rebuttal, Ms. Wood? Your Honors, I would just indicate that if you look at the statute that relates to other options available to a trial court, and we review case law including case law from this district that discusses such, one of the things that I think is forgotten, and unfortunately I'm not in our trial courts, is that after a finding of unfitness, the trial court must still give full and serious consideration to the child's best interest. A child's best interest may be best served by maintaining an already existing relationship with the parent. That comes out of a court district case in 2002. You don't see that happening in our trial courts where the trial court will look at alternatives to termination including section 404AJ guardianship provisions. And I outlined within pages 30 and 31 of our brief wherein I think those guardianship policies would meet the needs of this case. So I concur. This option was not presented to the trial judge.  And I think this was a thought for the trial court. But this is an issue that is being overshadowed in our trial courts, I believe throughout our state, by this need to feel that the only option available is termination. And I disagree with counsel's argument that that can only be considered when the option of adoption is ruled out. Even if that were the case, the court could have ruled out an option of adoption and followed the thoughts that I presented earlier today, which is why can't these children enjoy maintaining relationships with many people in their lives that are vested in them as part of another order? An order that can't be revoked without a court's analysis and petitioning by a parent. I think it's noteworthy, too, that yes, Naisha Mitchell took some time to get services done in this case. Do we automatically assume that we can't consider what she did get done? At the May 30, 2017 hearing, the caseworker admitted that she had completed all of her services, but was unsure about the counseling portion because Joel Eckert had testified that she needed at least a year of therapy. And if you read the testimony of that hearing, it's difficult to ascertain why Jason Woodward's therapy was not enough. So this may have been a parent who was slow out of the gate, but it is a parent who completed all of her services, 6 out of 7 for the caseworker, the counseling being kind of cloudy as to what was going to be expected. In December of 2018, or 17, the same analysis was made before the court by June. And so in January of that final hearing, we're now looking at homelessness, which I would suggest wasn't homelessness, you're staying with friends and family, and a period of unemployment. I don't believe that's enough. And the relationship, the important relationship these children have with their parents. And I think it's incumbent upon our courts to be very careful to customize orders that meet the needs of these particular children. Thank you. Thank you, counsel. This matter will be taken under advisement. We'll be in recess at this time.